# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-512

**STATE OF LOUISIANA**

**VERSUS**

**CHRISTOPHER GOODLEY,**
**A/K/A CHRISTOPHER BRYANT GOODLEY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 102417-FB
HONORABLE CHUCK R. WEST, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Trent Brignac**
**District Attorney**
**Thirteenth Judicial District**
**Julhelene E. Jackson**
**Assistant District Attorney**
**P.O. Drawer 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Chad Ikerd**
**Louisiana Appellate Project**
**P.O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Christopher Goodley**

**PETERS, J.**

The defendant, Christopher Bryant Goodley,[1] appeals his conviction of first degree murder, a violation of La.R.S. 14:30. For the following reasons, we affirm his conviction in all respects.

## DISCUSSION OF THE RECORD

On January 28, 2015, the State of Louisiana (state) charged the defendant by grand jury indictment with the November 2, 2014 first degree murder of Delsie Williams, his eighty-year-old grandmother. After a four-day trial beginning on February 1, 2016, a jury returned a verdict finding the defendant guilty as charged. Immediately after the jury returned its verdict, the defendant orally moved for both a post-verdict judgment of acquittal and a motion for new trial, and the trial court rejected both motions. The defendant then orally moved for an appeal of his conviction, and the trial court granted that motion. The defendant subsequently filed a written motion for appeal, and the trial court executed a written order to that effect on February 16, 2016. Nine days later, on February 25, 2016, the trial court sentenced the defendant to life in prison at hard labor without the benefit of probation, parole, or suspension of sentence.

In the appeal now before us, the defendant raises the following assignments of error:

> 1. Christopher Goodley's appeal is premature because the trial court granted an order appealing his conviction prior to the trial court imposing a sentence.

> 2. The trial court erred by denying Christopher Goodley's post-trial motion for judgment of acquittal because the state failed to prove beyond a reasonable doubt that Christopher had the requisite specific intent to be found guilty of first or second degree murder because his intoxication vitiated any specific intent.

---

[1] The defendant's last name is spelled "Goodly" in the grand jury indictment. However, throughout most of the transcript and briefs his name is spelled "Goodley." We will use the latter spelling in this opinion.

3.   The trial court erred by denying Christopher Goodley's motion [to] suppress his statements to police because they were not freely and voluntarily given due to being highly intoxicated at the time.

## OPINION

### *Assignment of Error Number One*

Louisiana Code of Criminal Procedure Article 916 provides the following with regard to when a trial court is divested of jurisdiction to act in a criminal proceeding:

> The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction to take any action except as otherwise provided by law and to:
>
> (1)   Extend the return day of the appeal, the time for filing assignments of error, or the time for filing per curiam comments in accordance with Articles 844 and 919.
>
> (2)  Correct an error or deficiency in the record.
>
> (3)  Correct an illegal sentence or take other appropriate action pursuant to a properly made or filed motion to reconsider sentence.
>
> (4)  Take all action concerning bail permitted by Title VIII.
>
> (5)  Furnish per curiam comments.
>
> (6)   Render an interlocutory order or a definitive judgment concerning a ministerial matter not in controversy on appeal.
>
> (7)  Impose the penalty provided by Article 844.
>
> (8)  Sentence the defendant pursuant to a conviction under the Habitual Offender Law as set forth in R.S. 15:529.1.

Thus, it is clear that the trial court sentenced the defendant after entering an order of appeal and, therefore, after it had been divested of jurisdiction to act on such matters.  However, that factual finding does not necessarily require a dismissal of the appeal and remand for resentencing.

2

The fifth circuit faced a similar factual scenario in *State v. Lampkin*, 12-391 (La.App. 5 Cir. 5/16/13), 119 So.3d 158, *writ denied*, 13-2303 (La. 5/23/14), 140 So.3d 717, wherein the trial court granted an appeal prior to sentencing. That court recognized the provisions of La.Code Crim.P. art. 916, but concluded that the defendant's appeal should not be dismissed with the following analysis:

> Ordinarily, a premature appeal need not be dismissed when a sentence is imposed after the defendant's motion for appeal is filed. *State v. Washington*, 98-69 (La.App. 5 Cir. 1/26/99), 727 So.2d 673, 675 (citation omitted). Here, the trial court lacked jurisdiction to impose sentence pursuant to La.C.Cr.P. art. 916. A defendant can appeal from a final conviction only where sentence has been imposed. *State v. Chapman*, 471 So.2d 716 (La.1985); *State v. London*, 316 So.2d 743 (La.1975).

> Although this appeal is premature because the trial court lacked jurisdiction to impose sentence, we find *State v. Brooks*, 633 So.2d 816, 818 (La.App. 4 Cir.1994), *writ denied*, 94-1939 (La.9/3/96), 678 So.2d 548, to be applicable in the present case. In *Brooks*, as in this case, the defendant's motion for appeal was granted prior to the imposition of sentence. *Id.* The Fourth Circuit did not dismiss that appeal, quoting *State v. Martin*, 483 So.2d 1223, 1225 (La.App. 4 Cir.1986):

>> The Louisiana Supreme Court and this court, in handling similar situations in civil actions where an appeal was granted prior to the signing of the judgment, have refused to dismiss the appeal. *Matter of Parker*, 399 So.2d 607 (La.1981). *Palmer v. Wren*, 361 So.2d 1206 (La.1978); *City of New Orleans v. Kirzner*, 447 So.2d 66 (La.App. 4 Cir.1984), *writ denied*, 466 So.2d 1303 (La.1985). We choose to follow a similar line of thinking in criminal cases on point with the one at bar. Dismissing the appeal would simply result in a delay of the appellate process, and hinder defendant's right to appeal. Accordingly, we conclude that where a sentence is imposed after defendant's motion for appeal is filed and granted, the appeal will not be dismissed.

> Under the circumstances of this appeal, defendant's motion for appeal should not be dismissed as this would only result in a delay of defendant's right to appellate review.

*Lampkin*, 119 So.3d at 162.

We do note that in two more recent cases, *State v. Johnson*, 13-75 (La.App. 5 Cir. 10/9/13), 128 So.3d 325 and *State v. Griffin*, 13-701 (La.App. 5 Cir. 3/12/14), 138 So.3d 90, the fifth circuit reached a different conclusion from its holding in *Lampkin*. In both of these cases, the trial court ruled on a motion for new trial after granting the defendants' motion for appeal, and in each case, the fifth circuit concluded that the trial court lacked jurisdiction to sentence the defendant, dismissed the appeal, and remanded the matter to the trial court for a ruling on the new trial motion before acting on the motion for appeal. However, as was specifically recognized by the fifth circuit in *Johnson*, we find the two rulings to be distinguishable from the holding in *Lampkin*.

In *Johnson*, 128 So.3d 325, the fifth circuit reiterated the holding in *Lampkin* that the divesting of jurisdiction in the trial court does not always require the dismissal of an appeal where the dismissal would delay a defendant's right to an appellate review of his conviction, but held *Johnson* was distinguishable from *Lampkin* because *Johnson* involved the trial court's ruling on a motion for new trial after it had been divested of jurisdiction. This distinction was particularly important in *Johnson* because one of the issues on appeal was the trial court's denial of the defendant's motion for new trial.

> Under the particular circumstances of the present case, where the trial court, after having been divested of jurisdiction, denied defendant's motion for a new trial, the substance of which he then raised on appeal, we find a remand is proper. Before this Court, a court of review, addresses the merits of an issue that the trial court improperly considered, in light of due process considerations, defendant is entitled to have those merits considered by a trial court properly vested with jurisdiction. Although equitable considerations of judicial economy are as pertinent here as in other cases, this case is distinguishable because it presents a definite issue of due process concern. Under such circumstances, we find that defendant's due process rights should not yield to equitable considerations of judicial economy. Consequently, we are constrained to vacate the sentences imposed on defendant . . . and remand this matter to the trial court to

4

rule on defendant's motion for a new trial, and, if denied, to resentence defendant.

*Id.* at 329.

Although we agree with the defendant's argument that the order of appeal was issued prematurely, we find the ruling in *Lampkin* to be persuasive given the facts before us. Because the dismissal of the present appeal would only result in a delay of the defendant's right to appeal, we decline the request to dismiss his appeal.

### *Assignment of Error Number Two*

The defendant does not deny that he killed his grandmother. Instead, he asserts in this assignment of error that the state failed to prove beyond a reasonable doubt that he had the requisite specific intent to commit the offense of first degree murder; and therefore, the trial court erred in denying his motion for post-verdict judgment of acquittal. Specifically, he asserts that his intoxicated state at the time of the offense vitiated any specific intent and that he should have been convicted of a lesser and included responsive offense.

When a defendant asserts an insufficiency of the evidence defense, the standard of appellate review is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record

must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As it applies to this matter, La.R.S. 14:30(A)(5) provides that "[f]irst degree murder is the killing of a human being . . . [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older." Thus, the offense does require a specific intent.

The evidence establishes that on November 2, 2014, the defendant resided with his grandmother in her Ville Platte, Louisiana home and that sometime that day he beat her to death with an aluminum baseball bat; removed her blood-stained capri pants and stuffed them into a trash can; loaded her partially clothed body into the trunk of her automobile; and disposed of the body in a field where it was discovered later that day by Mark Tremie, the owner of the field, who immediately reported his finding to law enforcement personnel.

Evangeline Parish Sheriff's Detective Elliot Thomas was called to Ms. Williams' home on the evening of November 2, 2014, and led the investigation of the homicide. When Detective Thomas arrived on the scene, he observed blood on the trunk of an automobile parked in the carport of the house, and traced a blood trail from the house to the back of the automobile. Once inside the house, he observed a pair of white blood-stained capri pants and a calendar in a garbage can, as well as what appeared to be blood stains on the floor and kitchen counter. Soon after arriving at the scene, he received a telephone call that Ms. Williams' body had been discovered in Mr. Tremie's field; and further investigation at that location resulted in the recovery of, among other items, a blood-stained white sheet, a white towel with red and blue stripes, and a plastic bag. Further investigation established

6

that Ms. Williams had been pulled from the trunk of the automobile and dragged through the grass into the field.

Using information derived from the investigation at the crime scene as well as the field where the body was found,[2] Detective Thomas quickly determined the defendant to be his prime suspect in the homicide. Law enforcement personnel apprehended the defendant the next day in an abandoned trailer across town from his grandmother's home.

Once Detective Thomas had the defendant in custody, he began an initial interview of the defendant at 1:30 p.m. on November 3, 2014. However, this interview lasted only moments because Detective Thomas very quickly concluded that the defendant appeared to be confused and under the influence of narcotics or alcohol. Given the communication barrier, Detective Thomas decided to maintain the defendant in custody in order to allow him a period of time to overcome the effects of whatever was in his system.

Two days later, Detective Thomas began a second interview with the defendant and found the defendant's demeanor to be "much different" from the first interview. Still, although the defendant was able to respond to the questions asked of him and appeared to understand what was going on, Detective Thomas obtained little helpful information. Later that same afternoon, Detective Thomas received a call that the defendant wanted to speak with him. In this third interview, Detective Thomas found that although he was "a little emotional," the defendant appeared to understand what was going on around him and that "he had decided

_____

[2] This information included statements from Mr. Tremie, from Mary Joseph (Ms. Williams' neighbor), from Laura Stevens (Ms. Williams' sister), and from Kimble Tezeno (Ms. Williams' niece). When the three women were unable to contact Ms. Williams by telephone, they went to her home after the homicide (with Ms. Joseph arriving first and the other two women joining her for a second observation), saw the bloody aftereffects of the offense, and contacted law enforcement officials.

that he wanted to talk." In the interview that followed, the defendant provided the detective a full statement concerning his involvement in the homicide.[3]

The defendant told Detective Thomas that he had gone to a neighbor's house that morning to "smoke a blunt" and the fact that he was still under the influence of the drugs when he returned home made his grandmother upset. When she continued to criticize him, he stated that he retrieved an aluminum baseball bat and hit her on the head as she sat in her recliner. He stated that he continued to hit her until she stopped moving,[4] and he then began to try to clean up the crime scene using a dishtowel. The defendant explained that the white capri pants came off his grandmother's body as he began dragging her to the door to deposit her in the trunk of the automobile. He simply dumped them in the garbage can and deposited a calendar over them to cover them up. Additionally, he placed a plastic bag over his grandmother's head to prevent more blood from flowing onto the floor. After dragging her body into the field, the defendant returned to the house to clean the scene. The defendant told Detective Thomas that the aluminum baseball bat he used to kill his grandmother could be found in the closet in her room. The bat was found at that location, and all of the other physical evidence recovered at the field and Ms. Williams' home was consistent with the defendant's version of the offense.

With regard to the actual attack, the defendant told Detective Thomas that he blindsided his grandmother with the initial blow and that after he completed the act, he went outside and smoked a cigarette. In fact, he recalled his grandmother

---

[3] In all three interview attempts, Detective Thomas provided the defendant with notice of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), and the defendant executed a written waiver of those rights.

[4] The defendant estimated that he struck her for approximately forty minutes.

say "Chris who's hitting me?" after he first hit her. He told the detective he did not answer his grandmother, and simply continued to hit her.

The defendant testified in his own defense and suggested that he has a severe narcotics addiction with no limit to the type of illegal narcotics he would use.[5] He suggested that he often hallucinated and blacked out when he mixed drugs, which he did on a regular basis. His defense to his grandmother's murder was that prior to the offense he had consumed all sorts of drugs, including PCP, cocaine, and marijuana.

According to the defendant, he only wanted to sleep when he returned to his grandmother's house but she wanted him to go to church with her. He became irritated and ingested some cocaine to calm himself as she prepared to go to church. As he tried to sleep, she kept waking him and when he left his bed at about 10:00 a.m., he found that she had decided not to go to church. He then returned to his bed and slept until his grandmother woke him again at approximately 1:00 p.m. According to the defendant, he became angry, grabbed the baseball bat, walked down the hallway into the room where his grandmother was sitting, and began striking her with the bat.

The defendant testified that when he was first taken into police custody, he lied about what happened because he did not want to go back to prison.[6] At first, he thought everything that happened was a dream, but after spending two days in custody, he realized it had actually occurred. He then contacted Detective Thomas and confessed to killing his grandmother and dumping her body in the field. Although he claimed that he would not have killed her if he had not been so high

---

[5] He suggested that his habit included marijuana, cocaine, crystal meth, PCP, and "possibly anything under the moon." His problem with illegal drugs was confirmed by the testimony of Chantel Estes, his probation and parole officer.

[6] The defendant had previously been convicted of simple burglary and sentenced to prison.

9

on illegal drugs, he acknowledged that he had sufficient control to know that he needed to clean the crime scene after disposing of her body.

On cross-examination, the defendant could not remember how many times he struck his grandmother, but he remembered that "she held in there a long time[.]" He also recalled placing a sheet over his grandmother after he placed her body behind the sofa; and he remembered Ms. Joseph coming to the door and pointing out the blood on the fender of the automobile. He waited until dark to dispose of his grandmother's body because he was trying to determine what he was going to do. He acknowledged that he had the presence of mind to put a plastic bag over his grandmother's head to keep her from bleeding all over the house, to throw her pants in the trash, to take a calendar off the wall and throw it in the trash can to soak up and cover up the blood, and to put towels in the trunk of the automobile to keep blood from staining the trunk. After dumping the body in the field, he even telephoned a girlfriend[7] and discussed with her how to get away with what he had done. Finally, he acknowledged that the only evidence of his drug use on November 2, 2014, was his own self-serving testimony.

Assuming for purposes of argument that the defendant was under the influence of narcotics at the time he beat his grandmother to death, we note that the supreme court has stated the following concerning the intoxication defense in a murder prosecution:

> Voluntary intoxication will not excuse a crime, but it is a defense to a specific intent offense if the circumstances demonstrate that intoxication precluded formation of the requisite intent. *See* La. R.S. 14:15(2); *State v. Legrand*, 02-1462, p. 7 (La. 12[/3/03),] 864 So.2d 89, 95-96. The defendant has the burden of proving his intoxication defense; thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication. *See State v. Smith*, 94-2588, p. 5 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034, 1038,

---

[7] The girlfriend was not identified by the defendant in his testimony.

10

> *citing State v. Davis*, 92-1623, p. 10 (La. 5/23/94), 637 So.2d 1012, 1020. Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact. *See Davis*, 92-1623 at 10, 637 So.2d at 1020.

*State v. Mickelson*, 12-2539, pp. 6-7 (La. 9/3/14), 149 So.3d 178, 183 (footnote omitted).

A decision from this circuit addressing similar facts is *State v. Carroll*, 95-859 (La.App. 3 Cir. 1/31/96), 670 So.2d 286. In that case, the defendant and two others were intoxicated at a beach when the victim, who was extremely intoxicated, asked them for a ride. They consented to give him a ride, but became increasingly angry toward him as the trip progressed. The driver pulled to the side of the road and all three men exited the truck in which they were riding, beat the victim severely, and put him back into the truck. When the victim regained consciousness and began hollering, the three men stopped the truck again and, this time only Carroll beat the victim back into unconsciousness. When the driver stopped the next time, the three men brutally beat the victim, put rocks in his shirt, and threw him off a bridge into the water below. Carroll and a co-defendant were found guilty of second degree murder. On appeal, Carroll claimed the jury erred in failing to find that his intoxication precluded him from forming specific criminal intent.

Finding that the jury did not err in rejecting the defendant's intoxication defense, this court stated the following:

> Little evidence was presented in this case on the issue of intoxication as it relates to the preclusion of specific criminal intent of this particular defendant. Much of the evidence adduced to convict Carroll was by way of the confessions of him and his co-defendant Norman Jean. Except for minor differences, mostly self-serving to the person confessing, the two confessions corroborate and substantiate each other. While both Carroll and [the co-defendant] stated in their confessions that all four men had been drinking, the amount of alcohol consumed was not clearly established, nor was the "preclusive" effect of whatever amount that was consumed by Carroll particularized as to him individually.

11

In addition, that Carroll was able to recall accurately and clearly the details of a crime scenario that extended over a considerable time period does not go toward proving his point. He was mentally clear enough, and had the motor skills, to savagely beat the victim at three different places and times. Carroll also had the presence of mind to then participate, in concert with the others, in a series of actions to coverup the crime and to deflect suspicion from himself and the others: after finally beating Arceneaux to death, Carroll helped in stuffing the victim's shirt with rocks and in throwing him off the bridge and into the water below; he also disposed of the log that had been used to batter Arceneaux, and he helped in washing Jean's truck to remove evidence of the victim's blood.

This crime was deliberately committed over a long period of time in a particularly brutish manner by Carroll and his confederates. Specific criminal intent is a state of mind and need not be proven as fact, but may be inferred from the circumstances present in the case and from the action of the defendant. Carroll confessed that he remembered becoming angry at the victim, continuing to be angry at the victim, and venting that anger in a series of merciless beatings. He also confessed that during that time he had the urge to kill the victim. Essentially, Carroll now asks this court to presume his intent had been negated due to intoxication simply from the fact that he had been drinking, that the victim had a high blood alcohol content at death (thus his must have been similarly elevated), and because his crime was (allegedly) out of character. He, however, cites no legal authority on point in support of such a presumption based on those reasons, nor does he make a compelling legal argument for this court creating one.

It was the role of the jury in this case to weigh the credibility of the witnesses. This it did, to the defendant's detriment. We refuse to second-guess the credibility determinations of the jury beyond the sufficiency of the evidence evaluations under the *Jackson* standard of review. Scant testimony was presented regarding the defendant's intoxicated state as it related to the negation of his specific criminal intent. The confessions of Carroll and Jean, taken together and in tandem, leave no doubt that Carroll actively desired the prescribed criminal consequences, death or great bodily harm, to follow his actions of violence against the victim. The jury believed that Carroll had the specific intent to kill or inflict great bodily harm, and this court will not disturb that finding.

*Id.* at 289 (citation omitted).

Similarly, in the present case, little evidence was presented on the issue of intoxication as it relates to the preclusion of the defendant's specific criminal intent. As in *Carroll*, the defendant in the present case was able to recall details of

12

a crime scenario that lasted several hours; and these details were corroborated by physical evidence. Additionally, the defendant was mentally clear enough and had the motor skills to savagely beat the victim, dispose of the victim's body, and attempt to clean the murder scene. He asked the jury to presume his intent had been negated due to his drug use, and the jury chose to reject this presumption. *See also, State v. Baumberger*, 15-1056, p. 9 (La.App. 3 Cir. 6/1/16), ___ So.3d ___, ___[8] (holding that "specific intent can be formed in an instant").

Although there was testimony that the defendant had a drug problem and appeared to be under the influence of something when the detectives initially attempted to interview him, the record contains no evidence that the defendant was under the influence to the extent that he could not form specific intent at the time of the offense. Additionally, there was no testimony that the defendant did not consume drugs after the offense and before he spoke to detectives. The jury heard evidence of the defendant's drug use and rejected his intoxication defense. This court will not disturb that finding. Therefore, we find no merit in this assignment of error.

### *Assignment of Error Number Three*

In this assignment of error, the defendant asserts that the trial court erred in denying his motion to suppress his three statements to Detective Thomas. He argues that his statements should have been suppressed because they were not freely and voluntarily given due to his highly intoxicated condition. Specifically, he asserts in brief that when he came into the custody of the state, he was under the influence of mind altering drugs "which rendered him unconscious of the consequences of his statements[,]" and that his condition did not change between the first and other two interviews because he ingested more illegal drugs while in

---

[8] This case is cited at 2016 WL 3077491.

custody. Specifically, he asserts that he would not have given any of these statements had he been sober. Furthermore, he asserts that the third interview was deeply prejudicial to him because he was forced to testify in order to explain his prior statements. He summarizes his argument in brief as follows:

> For these reasons, all three statements during interrogation, made under the influence of heavy drugs, should have been suppressed by the trial court, and the court's failure to suppress these statements was not harmless error. Without the interrogation statements and Christopher's testimony at trial, the jury would have only been left with circumstantial evidence that Christopher's DNA was on a bat stored inside the home in which he resided, and to which he had access, as well as Ms. Williams' blood in her own car. This Court should now correct the trial court's error and rule that the three statements should have been suppressed and that Christopher should be given a new trial.

On the other hand, the state argues that the defendant's statements were given after a knowing and intelligent waiver of his rights and were not the result of any coercion. Additionally, the state notes that the defendant did not confess to killing his grandmother in either of the first two statements, and that the third statement was precipitated by the defendant's request to speak with the detective, not by the state's attempt to obtain a third statement. The state further asserts that there exists no evidence to establish that the defendant obtained and consumed illegal drugs while incarcerated between the first and third statements. The state summarizes its argument as follows (alteration in original):

> On three separate occasions, appellant is read his *Miranda* rights and signs a *Miranda* Rights form, indicating that he was read his rights, that he understood his rights, and that he was not made any promises to get him to answer any questions or under any pressure to give up those rights. The third interview with detectives was as a result of appellant requesting to speak to them, and he voluntarily gave a recorded statement that amounted to a confession. According to the transcription of all three statements, appellant clearly indicated that he understood his rights and he was willing to answer questions posed to him. Therefore, appellant knowingly and intelligently waived his rights three separate times. It was not until the third statement, which occurred two days after appellant was arrested, that he confessed to murdering his grandmother; and only after he

14

requested to speak to detectives. It is clear from the records of the suppression hearing and the trial that appellant **knowingly and intelligently** waived his rights **[emphasis added]**.

The trial court heard and rejected the motion to suppress before the beginning of the jury trial resulting in the defendant's conviction. In addressing the merits of this assignment of error, we first note that the statements themselves were not introduced at the suppression hearing or at trial—although a transcript of each statement is included in the appellate record.[9] Still, even without referring to the transcripts, the record is sufficient to review the assigned error as the substance of the statements was discussed in testimony presented at the suppression hearing; and the substance of the third statement in particular was discussed in detail at trial by both Detective Thomas and the defendant.

Detective Thomas testified at the suppression hearing concerning the defendant's signing of his warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), as well as the defendant's understanding of those warnings and the consequences of any statement. He testified that he explained the *Miranda* rights to the defendant and caused him to execute a waiver of rights in each of the three interviews.[10]

The record establishes that the first interview was quickly terminated because of the defendant's apparent intoxicated condition and nothing was gained by the state in that interview. In fact, during that interview, the defendant informed Detective Thomas that he had consumed drugs and alcohol approximately two hours before the interview was attempted.

---

[9] It is clear from a reading of the ruling on this issue that the trial court reviewed the actual transcripts in rejecting the motion.

[10] The state introduced all three waiver of rights forms executed by the defendant in the suppression hearing.

The second interview was initiated two days later and terminated because of the defendant's evasive answers. Between the first and second interview, the defendant remained in custody at the Evangeline Parish jail. The second interview resulted in no information helpful to the state, and the defendant was returned to jail. Later that same day, he initiated the third interview.

In the third interview, the defendant confessed to killing his grandmother and provided the details of the offense which have been previously set forth in this opinion. Although the defendant described his drug addiction in detail during this interview, Detective Thomas did not subject the defendant to drug testing prior to his second and third statements. He chose not to do so because of the defendant's change in demeanor and his lack of access to illegal drugs while in jail.[11] He did not believe that the defendant's condition at the time of the second and third interviews had any effect on his ability to understand the questions asked of him or to respond appropriately to those questions.

The defendant's testimony at the suppression hearing was basically that he had a lack of understanding of the proceedings or of the consequence of his participation. He testified that immediately before being apprehended he had ingested a significant amount of cocaine and smoked a few "wet cigarettes,"[12] and the first statement was taken within two hours of that activity. He suggested that in the first statement he "just went on ahead and agreed with whatever was going on." Although the defendant stated that he voluntarily gave the statement, he also suggested that he ignored the information concerning his right to a lawyer because

---

[11] Detective Thomas acknowledged that, on occasion, contraband in the form of illegal narcotics was brought into the local jail, but he asserted that the defendant did not have access to such contraband because he had been isolated from the general jail population.

[12] "Wet cigarettes" are described in the record as marijuana cigarettes dipped into formaldehyde or laced with PCP. According to Detective Thomas, smoking such cigarettes could result in severe side effects, depending on the individual's tolerance.

he did not know how to contact a lawyer and that he thought he had no choice but to give the statement because he "was so scared."

On cross-examination, the defendant admitted that he contacted Detective Thomas to "tell them the story," and that when he signed the three separate waiver of rights documents he understood his *Miranda* rights and knew what Detective Thomas was asking of him. He also acknowledged that he was not forced to give the statements, and that he was not promised anything for cooperating.[13]

With regard to the general standard for reviewing a trial court's ruling on a motion to suppress, the supreme court, in *State v. Blank*, 04-204, p. 10 (La. 4/11/07), 955 So.2d 90, 103, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494 (2007), stated that:

> A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported by the evidence. *State v. Benoit*, 440 So.2d 129, 131 (La.1983); *State v. English*, 582 So.2d 1358, 1364 (La.App. 2nd Cir. 1991), *writ denied*, 584 So.2d 1172 (La.1991). Credibility determinations lie within the sound discretion of the trial court and its rulings will not be disturbed unless clearly contrary to the evidence.

More particularly, the supreme court stated the following in *State v. Thornton*, 12-95, pp. 1-4 (La. 3/30/12), 83 So.3d 1024, 1025-26 (alteration in original), with regard to the ever changing requirements of review:

> Although in the past this Court rejected the view in other jurisdictions that "a confession may be involuntary in the due process sense only where the declarant has been subjected to police custody, external pressure or coercion," *State v. Glover*, 343 So.2d 118, 128 (La.1976) (on reh'g) (statements made by defendant to his former common-law wife wired for sound by the police rendered involuntary as a result of defendant's florid undifferentiated schizophrenia), our current jurisprudence subscribes as a matter of state law to the rule of *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth

---

[13] On redirect, the defendant testified that before the third statement, he asked Detective Thomas if he would contact his family to get him some clothes; and that after the statement was completed, Detective Thomas followed through with that promise.

Amendment." . . . ("[A]n essential prerequisite for suppressing a statement on voluntariness grounds is misconduct or overreaching by the police.") . . . .

Connelly has therefore also modified our former jurisprudential rule that intoxication may negate the voluntariness of a statement if it is of such a degree that it renders the defendant "unconscious of the consequences of what he is saying." State v. Simmons, 443 So.2d 512, 516 (La.1983). After Connelly, diminished mental capacity, which may result from intoxication, remains relevant to the voluntariness of a statement only to the extent that it "made mental or physical coercion by the police more effective." United States v. Chrisman, 965 F.2d 1465, 1469 (7th Cir.1992), see also United States v. Gaddy, 532 F.3d 783, 788 (8th Cir.2008) (test is "whether these mental impairments caused the defendant's will to be overborne") . . . .

Thus, for due process purposes, defendant's statements were not involuntary, i.e., they were not the products of a will overborne by police coercion. Nor, in purely statutory terms, were they the product of "fear, duress, intimidation, menaces, threats, inducements or promises." La. R.S. 15:451. While intoxication remains relevant to the question of whether a Miranda waiver is not only voluntary but also knowing and intelligent, . . . in the present case, we need not resolve the question of whether defendant, who appeared to the officers to understand the explanation of her Miranda rights, made a valid waiver when she continued to respond to questioning in a coherent and rational manner although she also appeared heavily "narcotized."

At the suppression hearing, the trial court reached the conclusion that the defendant's statements were freely and voluntarily given based primarily on Detective Thomas' testimony, and it is well-settled that "[t]he testimony of the interviewing police officer alone may be sufficient to prove the defendant's statement was given freely and voluntarily." State v. Harrington, 12-886, p. 4 (La.App. 3 Cir. 2/13/13), 129 So.3d 38, 40-41 (quoting State v. Roshell, 40,374 (La.App. 2 Cir. 12/14/05), 916 So.2d 1268, writ denied, 06-771 (La. 10/6/06), 938 So.2d 69).

Considering the evidence submitted at the hearing on the motion to suppress the defendant's three statements, we find no error in the trial court's determination

18

that the statements were voluntary and should not be suppressed.  That being the case, we find no merit in this assignment of error.

## DISPOSITION

For the foregoing reasons, we affirm the conviction of Christopher Goodley, a/k/a Christopher Bryant Goodley, in all respects.

**AFFIRMED.**